IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 16-01686-TUC-CKJ(LAB) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Kristen Theresa Morris and, Marco Antonio Montijo | |
| Defendants. | |

The District Court referred this case to the Magistrate Judge for a hearing on the defendants' motion to suppress evidence. (Docs. 35 and 37).  Defendants Kristen Theresa Morris and Marco Antonio Montijo argue that all evidence obtained as a result of the stop of Ms. Morris' vehicle on August 10, 2016 must be suppressed because the stop was not based on reasonable suspicion, in violation of the Fourth Amendment. The defendants also claim the vehicle was unlawfully searched without a warrant.1

An evidentiary hearing was held on 12/13/16.  United States Border Patrol (USBP) Agent Salvador Rubalcava and former USBP Agent Christopher Blanco testified.

---

1 The parties agree that as a passenger in the vehicle, Defendant Montijo has standing to challenge the stop. See *Brendlin v. California*, 551 U.S. 249 (2007).

Government's Exhibit 3, a photo of the back of Ms. Morris' Tahoe with the cargo door open, was admitted into evidence.

**Charge:**

The defendants are charged in a two count indictment with Conspiracy to Possess with Intent to Distribute and Possession with Intent to Distribute more than 50 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846. (Doc. 19).

**Motion to Suppress:**

The defendants argue that their Fourth Amendment rights were violated when they were stopped by police without reasonable suspicion, and that any evidence obtained as a result of the illegal stop must be suppressed.

The Court concludes the initial seizure was lawful.  The defendants were subsequently arrested based on probable cause.  The warrantless search of the vehicle was based on probable cause and the consent of the vehicle's owner and driver, Ms. Morris.  The evidence is admissible at trial.

**EVIDENCE:**

*Salvador Rubalcava*

Salvador Rubalcava testified that he has been a Border Patrol agent since 2006, always assigned to the Wilcox, AZ station.  His duties focus primarily on traffic operations. When he is not working at the checkpoint, he conducts roving patrols on State Route (SR) 90.  He observes 1,000s of vehicles during each shift.  On average, he pulls out to get a better look at about 4 vehicles during his 6 ½ hour shift, and pulls over 2 or 3 of them. Rubalcava recognizes many of the local vehicles.

Rubalcava completed his initial training at the academy, was an operations instructor, and participates in field training and annual training. He stays informed of current trends through briefings at daily muster and intelligence briefings.

On 8/10/16 Rubalcava was on roving patrol operations on SR 90 near Benson, AZ. The checkpoints were closed because it was raining. He positioned his vehicle in the median north of where the checkpoint is usually placed to avoid interfering with local traffic, which is primarily south of the checkpoint. In his experience, smuggling increases when the checkpoint is down because smugglers know that cars will not be subject to inspection and dog sniffs. This is a high crime area.

At about 5:30 p.m., after Rubalcava observed traffic for about two hours, he saw a beige Tahoe with the driver's side front and back windows rolled down 4 to 6 inches. That caught his attention because, although it was not raining at Rubalcava's location, it was raining north and south of there. Open windows are significant in Rubalcava's experience because smugglers have told him that they open the windows when the odor of marijuana or people who have been walking in the desert without bathing becomes overwhelming. Rubalcava testified that he did not see any other vehicles that day with windows open, except the vehicle directly behind the Tahoe.

Agent Rubalcava observed a female driver and a male passenger in the Tahoe. He also noticed a black Malibu following very close behind the Tahoe. The Malibu had dark tint on the windows. Traffic was heavy and was moving steadily at about 60 or 65 miles per hour. Rubalcava had less than 10 seconds to observe the two vehicles as they passed his location. The vehicles were in the left lane, closest to the median where he was parked. The driver of the Tahoe had both hands on the steering wheel. She was looking straight ahead and looked frozen, as if she was holding her breath. The vehicles traveling one after the other with windows cracked open and the appearance of the occupants is what caught Rubalcava's attention.

    Rubalcava decided to follow the vehicles to get a closer look. He merged into traffic. It took him about 2 ½ miles and 3 minutes to catch up to the two vehicles, which were now travelling together in the right lane. Rubalcava was in the left lane, slightly behind the Malibu. He observed the passenger in the Tahoe put a phone to his ear, as if making a phone call. At about the same time, he saw the passenger in the Malibu lift his hand to his ear, and believed the passenger was taking a phone call, although Rubalcava did not see a phone in his hand. He surmised that the passengers in the two cars were communicating with each other. After a short time, each passenger put his hand down, as if the phone call ended, although that is not in the agent's report. Agent Rubalcava concluded that the two vehicles were driving in tandem.

    The Malibu sped up and moved into the left lane, in front of Rubalcava. The Tahoe slowed down. Agent Rubalcava has seen this before where the "heat" vehicle tries to draw the agent away from the "load" vehicle. Based on his experience he believed the Tahoe was the load vehicle because it is much larger and capable of carrying bundles of marijuana or undocumented people. He decided to stay with the Tahoe and risk losing the Malibu.

    Rubalcava called in the license plate of the Tahoe. It came back registered to Defendant Morris out of Sahuarita. Sahuarita is not in this area so Rubalcava believed the driver was bypassing an operational checkpoint, going out of her way to drive a route where the checkpoint was down. Agent Rubalcava called in to see if the Tahoe had any recent border crossings. It did not. That raised suspicion. A recent border crossing could have been to attend a medical appointment or for some other typical business reason, and would have explained the presence of the Tahoe in the area.

    At this time, Agent Rubalcava believed he had reasonable suspicion to stop the Tahoe. He knew that Agent Blanco and his canine were about a mile ahead and could provide backup. As he approached Blanco's location, Rubalcava activated his lights. He did not

see brake lights or any deceleration.  He used his siren briefly to get the driver's attention.  She still did not slow the vehicle.  Rubalcava believed this could be a failure to yield.

Suddenly the driver braked and made a sharp right turn onto a pullout, causing the rear tires to skid.  Rubalcava was not sure if the driver was going to stop, drive past the end of the pavement into the desert or if the occupants were going to flee on foot.  The Tahoe stopped at the end of the cul-de-sac.  Rubalcava got out of his vehicle and quickly approached the Tahoe's driver's side door, scanning the cargo area as he passed.  Defendant Morris rolled down the window.  Agent Rubalcava determined that there were no people in the back of the Tahoe who might pose a threat or flee.  He saw some items in the cargo area, including a blanket covering an item shaped like a bundle of marijuana.

When Rubalcava approached Ms. Morris, she was shaking, as was her passenger.  Both said they were nervous around law enforcement.  Rubalcava testified that in his experience, people he pulls over may be a little nervous but usually they are just annoyed.  Rubalcava asked Morris to turn off the engine and hand him the keys because he was still concerned she might flee.  Ms. Morris complied.  Rubalcava placed the keys on the hood of the Tahoe.  He did not smell marijuana.

At Rubalcava's request, Morris consented to a free air sniff by Agent Blanco's canine, Kenzo. The driver and passenger agreed to get out of the Tahoe.  Morris said that everything in the Tahoe was hers.  By this time USBP Agent Troxell had arrived on the scene.  Defendant Montijo, the passenger, went with Troxell.  Rubalcava asked Morris where she was coming from.  She said she had a job interview in Sierra Vista but would not give a name and phone number so Rubalcava could confirm.  Rubalcava thought it was late for someone to be coming from a job interview.

Rubalcava testified that Agent Blanco asked Morris if there were drugs in the Tahoe.  She answered that she possessed a medical marijuana card and sometimes rolled joints or smoked in the Tahoe.  Blanco wanted to put his dog in the car but Morris declined because

the dog's paws were muddy. Kenzo alerted to the presence of drugs and the agents searched the Tahoe. Exhibit 3 shows what the back of the Tahoe looked like with the cargo door open.

*Christopher Blanco*

Mr. Blanco testified that he started his career as a USBP agent in 2008. He attended the academy, participated in continuing training and became a supervisor. In 2015 he became a canine handler. On 8/10/16, Blanco had been a canine handler for 10 months. He was positioned that day on SR 90 with his dog, Kenzo, north of where the checkpoint is usually set up. The checkpoint was closed that day due to rain so he was working traffic operations.

Blanco heard on the radio that Rubalcava was stopping a vehicle near his location. He saw the vehicle approach with two marked Border Patrol vehicles behind it with their lights flashing. The car barely slowed down and didn't look like it was going to stop so he positioned his vehicle to block a possible escape. The car slid into a turnout and stopped. Blanco approached the vehicle and did a quick walk around it. The driver's side window was open. He did not smell marijuana.

The defendants were out of the vehicle. Ms. Morris was nervous and fidgety. Blanco asked for and received consent for a dog sniff. The dog alerted to the presence of drugs. Ms. Morris refused to allow the dog in the car because he was muddy but she told Blanco that he could search. He did and found bundles of marijuana in the cargo area.

**DISCUSSION**:

The Initial Stop

The defendants argue that the initial stop of the Tahoe was not based on reasonable suspicion. The Court disagrees.

The Fourth Amendment prohibits unreasonable searches and seizures by the

˘ 6 ˘

government. Those protections apply to brief investigatory stops of vehicles. *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002). To justify an initial inquiry and a brief investigatory detention, there must be reasonable suspicion that the person stopped is involved in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30 88 S.Ct. 1868, 1884 (1968). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence, and is less demanding than probable cause. *United States v. Sokolow*, 490 U.S. 1, 6 (1989) (citations omitted). It "is not a particularly high threshold to reach." *U.S. v. Valdes*-Vega, 738 F.3d 1074, 1078 (9th Cir. 2013). Yet, it is also more than an inchoate and unparticularized suspicion or mere hunch, and requires that the officer articulate facts supporting his suspicion. *Id*.

The court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002) (internal punctuation removed). In the present case, USBP Agent Rubalcava testified that he believed there was reasonable suspicion that the people in the Tahoe and the Malibu were involved in criminal activity because:

1) the Malibu was tailgating the Tahoe,

2) both vehicles had their driver's side windows rolled down 4 to 6 inches even though it was raining in the area,

3) no other cars that day had their windows rolled down and in Agent Rubalcava's experience drug and human traffickers roll down their windows because of overwhelming odors from marijuana and unwashed people,

4) the driver of the Tahoe was stiff and looked straight ahead,

5) the checkpoint was down due to rain, which increases smuggling activity,

6) the vehicles were in a high crime area close to the border,

7) the Tahoe was registered to an address in Sahuarita which is out of this area,

8) the Tahoe had no recent history of crossing the international border which meant

there was no obvious reason for it to be in the area,

9) after about 2 ½ miles, the vehicles were still travelling together but now in a different lane,

10) the passengers in the two vehicles appeared to be speaking to each other by cell phone,

11) the Malibu pulled in front of Agent Rubalcava and sped up, possibly in an effort to divert the agent's attention from the Tahoe, which had slowed down,

12) Agent Rubalcava believed the two cars were travelling in tandem,

13) the driver of the Tahoe failed to slow down when Agent Rubalcava illuminated his light bar and used his siren to get her attention,

14) the Tahoe suddenly braked and made a sharp right turn onto the pullout, skidding and appearing as if it might not stop before the pavement turned to desert.

The defendants argue that each of the factors relied on by Agent Rubalcava has an innocent explanation and that Rubalcava speculated about several factors, for example the reason for the windows being down, or whether the passengers were speaking to each other on cell phones.  The Supreme Court in *Arvizu* instructs that the Court must consider the officer's experience and specialized training, which allow him to make inferences and deductions about the information he observes that might escape an untrained person. *Arvizu*, Id.  The Court also held that a "totality of the circumstances" analysis is undermined by taking the factors one at a time to offer innocent explanations.  A "divide-and-conquer" analysis is precluded by *Terry*.

In the instant case, Agent Rubalcava's observations warranted further investigation, even though each of the factors on its own may be consistent with innocent behavior. There was reasonable suspicion for a brief investigatory stop of the Tahoe.

The Arrest

The defendants argued for the first time in their closing remarks that the defendants

were under arrest at the time USBP Agent Rubalcava asked Ms. Morris to remove the keys from the ignition and hand them to him. The parties agree that if that is the moment of arrest, it occurred without probable cause. However, that issue was not before the Court. The parties agreed to research the issue and either file a motion to suppress based on an illegal arrest or contact to Court to advise that no motion will be filed and the issue is withdrawn.

<u>The Search</u>

Ms. Morris consented to a free air sniff by Mr. Blanco's canine, Kenzo. The dog alerted to the odor of narcotics after it put its paws on the driver's side door through the open window. Ms. Morris declined permission to allow the dog into her car because his paws were muddy, but she told Agent Blanco that he could conduct a search.

Consent is one of the well-defined exceptions to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Here, Ms. Morris consented to the search that uncovered the marijuana. The search therefore did not violate Ms. Morris's rights under the Fourth Amendment.

The court finds in the alternative that the search was justified by probable cause. An alert by a well-trained narcotics-detection dog establishes probable cause for a search. *Illinois v.* Caballes, 543 U.S. 405, 409 (2005). Here, Mr. Blanco's dog alerted to the presence of contraband. That alert supplied the probable cause that justified the search of the vehicle.

The sniff itself was not an unreasonable search. Morris consented to the sniff and, because there is no legitimate interest in possessing contraband, the sniff did not "infringe an expectation of privacy that society is prepared to consider reasonable". *U.S. v. Jacobsen*, 466 U.S. 109, 122 (1984). Ms. Morris's rights under the Fourth Amendment were not violated by the search that uncovered the contraband.

**RECOMMENDATION**

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court **DENY** the motion to suppress evidence. (Doc. 35 )

Defense counsel may serve and file written objections within 14 days. If objections are not timely filed, the party's right to de novo review may be waived. No reply to objections shall be filed unless leave is granted from the District Court.

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

DATED this 23rd day of December, 2016.

_Leslie A. Bowman_
Leslie A. Bowman
United States Magistrate Judge