1  **WO**

2

3

4

5

6  IN THE UNITED STATES DISTRICT COURT

7  FOR THE DISTRICT OF ARIZONA

8

| | | |
|---|---|---|
| 9  United States of America, | ) | |
| | ) | |
| 10      Plaintiff, | ) | |
| | ) | No. CR 16-1686-TUC-CKJ (LAB) |
| 11  vs. | ) | |
| | ) | **ORDER** |
| 12  Kristen Theresa Morris and Marco | ) | |
| Antonio Montijo, | ) | |
| 13 | ) | |
| |      Defendants. | ) | |
| 14 | ) | |

15      On December 27, 2016, Magistrate Judge Leslie A. Bowman issued a Report and

16  Recommendation (Doc. 45) in which she recommended that the Motion to Suppress (Doc.

17  35) filed by Kristen Theresa Morris ("Morris") be denied.  Morris has filed an Objection to

18  Magistrate Judge's Report and Recommendation to Deny Defendant's Motion to Suppress

19  (Doc. 50); a Response to Defendants' Objection to Magistrate Judge's Report and

20  Recommendation (Doc 68) has been filed.  On January 17, 2017, the magistrate judge issued

21  a second, related Report and Recommendation (Doc. 52).  Morris has filed a Supplement to

22  Objection to Magistrate Judge's Report and Recommendation (Doc. 72).

23      The Court has reviewed the Motion to Suppress (Doc. 35), the Response (Doc. 38),

24  the Supplemental Memorandum in Support of Motion to Dismiss (Doc. 44),  the  Response

25  to  the  Supplemental  Memorandum  (Doc.  47),  the  December  27,  2017  Report  and

26  Recommendation (Doc. 45) ("12/27/16 R&R") (Doc. 45), the January 17, 2017 Report and

27  Recommendation (Doc. 57) ("1/17/17 R&R"), the Objection to Magistrate Judge's Report

28  and Recommendation to Deny Defendant's Motion to Suppress (Doc. 50), the Objection to

1    Magistrate Judge's Report and Recommendation (Doc. 66)[1], the Response to Defendants'

2    Objections to Magistrate Judge's Report and Recommendation (Doc. 68), the Supplement

3    to Objections to Magistrate Judge's Report and Recommendation to Deny Defendant's

4    Motion to Suppress (Doc. 72), and the transcript of the December 13, 2016, hearing

5    ("TR")(Doc. 60).

6          Morris, through her joinder to the co-defendant's objection, has requested oral

7    argument.  The Court finds it would not be assisted by additional evidence or argument and

8    declines to set this matter for hearing.

9

10   *Standard of Review*

11          The standard of review that is applied to a magistrate judge's report and

12   recommendation is dependent upon whether a party files objections – the Court need not

13   review portions of a report to which a party does not object. *Thomas v. Arn*, 474 U.S. 140,

14   150, 106 S. Ct. 466, 472-73, 88 L.Ed.2d 435 (1985).  However, the Court must "determine

15   de novo any part of the magistrate judge's disposition that has been properly objected to.

16   The district judge may accept, reject, or modify the recommended disposition; receive further

17   evidence; or return the matter to the magistrate judge with instruction." Fed. R. Civ. P.

18   72(b)(3); *see also* 288 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo

19   determination of those portions of the report or specified proposed findings or

20   recommendations to which objection is made.").

21

22   *Report and Recommendation – Factual Background*

23          Morris objects to the conclusions reached by Agent Rubalcava based on the time the

24   agent had to observe the vehicle as it passed him.  She asserts such testimony is not credible.

25   Deference to a "magistrate's credibility determinations is appropriate when supported by the

26

27   _____

28       [1]Morris has incorporated the arguments presented in co-defendant's objections.

record." 32 Am. Jur. 2d Federal Courts § 146 (May 2014); *United States v. Boone*, 951 F.2d 1526, 1536 (9th Cir.1991).  Agent Rubalcava testified:

> Q:      . . . When you're sitting there at the turnout by mile marker 304, approximately how long does it take a vehicle to pass you at 65 miles an hour?
>
> A.      It only takes a fraction of a second, but I don't -- I don't do tunnel vision just straightforward, I'm looking down the road to see what's coming up and what's coming up to my position.  I mean, the view that I had is not the split second view just right in front of me through -- through -- through just a cylindrical cone. I mean, I have to look left and right and that's -- that's what I do when I observe traffic.
>
> Q.      Okay. So you're looking down south?
>
> A.      Yes.
>
> Q.      So you see a car traveling north and you track it and it goes by you, correct?
>
> A.      Yeah, I keep on doing that.
>
> Q.      Split second in front of you, what, ten seconds the entire time you're able to observe?
>
> A.      Probably less than that from my field of view, less than ten seconds.
>
> Q.      Less than ten seconds?
>
> A.      I want to say between seven -- ten seconds is pretty far out.

TR, pp. 68-69.  The magistrate judge summarized this testimony as the agent having "had less than 10 seconds to observe the two vehicles as they passed his location."  12/27/16 R&R (Doc. 45), p. 3.

The Court finds the agent was estimating the amount of time he had to observe the vehicles.  The estimate given by the agent was reasonable and does not negatively impact his credibility.  Simply put, the Court finds there would have been sufficient time for Agent Rubalcava to make the observations that were the subject of his testimony.  The Court agrees with the magistrate judge's implicit finding the agents' testimony to be credible.

Morris, through her joinder of the co-defendant's objection, objects to the magistrate judge's finding that Agent Rubalcava testified that these two cars were the only cars with windows rolled down.  It is asserted that the agent stated that these were the only cars that had "both" windows rolled down.  The agent testified on cross-examination as follows:

Q.      What -- how can you tell between a car following another car and traveling in tandem?

A.      Well, they usually, they match each other on speed and lanes and they -- they -- they follow each other closely, that's one of the deals, and then out of all the vehicles that I had seen at that point in time since I got on duty, those were the only two vehicles that had their windows down. That's what brought my attention to them.

TR, p. 38.  The agent later testified:

Q.      And that night about how many cars had you seen pass that location with their windows up?

A.      That day, I was actually -- that day I was out on the field for just observing traffic for the first of my shift until I encountered Ms. Morris and the gentleman and, after that, it was processing. But during the time that I was observing traffic, those two were the only vehicles that had both their windows, driver and rear passenger, lowered, both vehicles. So there were four windows that passed in front of me that were lowered about four inches.

TR, pp. 79-80.  The Court interprets this testimony as the magistrate judge did – out of all of the cars Agent Rubalcava observed that day, these were the only cars with the front and rear windows both down (presumably on the driver's side).  However, the Court recognizes this may be subject to interpretation.  While the Court finds this is relevant either way the agent's statement is interpreted, the Court will not place significant weight on this factor.

Morris also objects to certain factors being considered as support for a finding of reasonable suspicion.  However, Morris is not asserting the testimony did not occur as summarized by the magistrate judge.  Therefore, this Court will accept the factual summary as set forth by the magistrate judge.  The Court will address the legal conclusions reached from those factors *infra*.


*Objections to the Report and Recommendation*

Morris asserts the magistrate judge incorrectly considered certain factors that should not have been part of the determination as to whether reasonable suspicion existed to stop Morris.  Morris also asserts that the factual findings by the magistrate judge do not establish reasonable suspicion.

- 4 -

1    *Factors that Were Observed After the Decision to Stop the Vehicle*

2         Morris asserts that the conduct observed by Agent Rubalcava after the agent decided

3    to stop the vehicle should not be considered in determining whether reasonable suspicion

4    existed to stop the vehicle.   Specifically, Morris asserts the following should not be

5    considered in determining if reasonable suspicion existed to stop the vehicle:

6         • the Malibu pulled in front of Agent Rubalcava and sped up after the vehicle driven
          by Ms. Morris had slowed down,

7
8         • the driver of the Tahoe, Ms. Morris, failed to slow down when Agent Rubalcava
          activated his emergency equipment causing him to use his siren to get the driver's
          attention,

9
10        • the Tahoe suddenly braking, making a sharp turn into a pullout, skidding on the
          roadway and appearing as if it might not stop before the pa[ve]ment turned into
          desert.

11   Objection (Doc. 50), p. 3.

12        First, the Court notes that Agent Rubalcava testified that the Malibu pulled in front

13   of him and sped up (after the vehicle driven by Ms. Morris, in the other lane, had slowed

14   down) prior to his determination that reasonable suspicion existed to stop Morris's vehicle.

15   Morris disputes this and asserts the agent made his decision after coming up behind the

16   vehicles and not making a note of the Malibu's license number.  However, the issue is not

17   whether reasonable suspicion existed when the agent made the decision to pull over the

18   vehicle, but the issue is whether reasonable suspicion existed "at the moment of the seizure

19   or the search[.]" *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (citation omitted) ("And in making

20   that assessment it is imperative that the facts be judged against an objective standard: would

21   the facts  available to the officer at the moment of the seizure or the search 'warrant a man

22   of reasonable caution in the belief' that the action taken was appropriate?").

23        The agent testified:

24        A.     . . . I activated my emergency lights to request the driver to pull over to the
          side.

25
26        Q.     And what was the response from the vehicle?

27        A.     I -- I turned on my emergency lights and I was right behind it. I turned my
          emergency lights and sirens and I was behind it and I flicked them back on and off in
28        order to try to gain their attention but there seemed to be no change on their speed or

manner in which she was still traveling. It was still the speed was constant. There was no -- no -- I didn't see -- I didn't see any brake lights coming on. That's usually an indicator that they are making an attempt to slow down or pull over. And I didn't see any of that for a little bit. So -- so I was assuming that she was going to fail to yield.

Q.      So what did you do at that point?

A.      So I started -- we were approaching to Mr. Blanco's location and when I was ready to call out a failure to yield, Mr. -- the driver stepped on the brakes, made a sharp right turn, she skidded on the highway. It was not enough that the vehicle would turn facing the opposite but it was enough to make noise with the wheels and actually have the vehicle's rear slide on the highway.

And right there where Mr. Blanco was at on the east side of the highway, there's like a pullout and it looks like the beginning of a subdivision or something like that and it has pavement and just like about 25 yards and then it's dirt and it has a cul-de-sac at the end and a return.  And that's where she turned into. And she was still showing speed as she was driving on the dirt, and then she came abruptly to a stop.

Q.      How far away from the desert did she stop?

A.      It was not -- it was not that far. I actually thought that she was going to continue driving into the desert because I actually had vehicles before in that specific place and that had made the turn just the way that she did and they drive into the desert and then -- and then there's people in there, they abscond and then the foot chase is on. But it was very close.  It was –

Q.      So, at that point, did you have any idea of what to expect when she stopped?

A.      No, no, no, no. At that point, I didn't know if she had ten people laying down below window level or if she had nobody or if she -- I didn't know what was going on at that point. I just --

Q.      So what did you do when she stopped?

A.      Well, I was right behind her and I abruptly came to a stop right behind her. I went as fast as I could towards the driver's -- the driver's position. And I took a glance in the rear -- in the rear section of the Tahoe and then I went straight to the driver's position.

Q.      Did you see anything when you took that glance into the rear?

A.      When I saw the glance, when I took a glance, what I was looking for, I was looking for people ready to jump at me as I was approaching, and I didn't see that immediately . . .

* * * * *

Q.      Okay. So after you checked the rear of the vehicle, what did you do?

A.      It was just -- I did not check into it. I didn't go and check, I went immediately, because I didn't know if they were going to just make a stop and go, which is when they stop and then they get you to get out of your vehicle and then they take off afterwards. So my concern was to keep that vehicle from moving and create

additional hazards to the agents involved and anybody else on the highway that would be traveling at that time.

So I went to the driver's position and I saw the driver and she was visibly shaking like a leaf. She was shaking.

Q.      And did you interact with her at all?

A.      Yes, I did. I just went to the driver's and by that time, you know, she -- she lowered the window as I was coming up and I went to the driver, and the first thing that I asked her is, I said, hey, I went, like, US Border Patrol and I said: Do you mind turning off the vehicle for me, please? And she did, she did, she complied right away.

And I said: Would you mind handing me the keys and allow me to hang on to them? And this is just to prevent any further hazards to me and everybody else. And she complies and says yes. And she handed me the keys. I placed the keys on the roof of the vehicle.

TR (Doc. 60), pp. 24-28.

The Ninth Circuit Court of Appeals has stated:

> *Hodari D.* involved some youths who ran away from two approaching police officers. One of the youths (Hodari) ended up running directly toward another police officer; Hodari did not see the officer until he was almost upon it, at which time he tossed away what appeared to be a small rock, which turned out to be crack cocaine. A moment later, the officer tackled and handcuffed Hodari.  [*California v. Hodari D.*, 499 U.S. 621, 623-24 (1991).  The question before the Supreme Court was whether the crack cocaine should have been suppressed because, at the time the cocaine was dropped, Hodari had been "seized" within the meaning of the Fourth Amendment.[1] As the Supreme Court noted, this question was relevant to the existence of founded suspicion, because the officer's seeing Hodari disposing of the crack cocaine could provide founded suspicion for the subsequent tackling.  *Id.* at 1549.
>
> > [1]The time of seizure was crucial because if Hodari was not seized at the time he disposed of the cocaine, the cocaine had been abandoned and suppression was therefore improper.  *Hodari D.*, 111 S.Ct. at 1549.
>
> The Court ruled that a seizure does not occur if, in response to a show of authority, the subject does not yield; in that event, the seizure occurs only when the police physically subdue the subject.  *Id.* at 1550.  "In sum, assuming that [the officer's] pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction *he was not seized until he was tack[l]ed*."  *Id.* at 1552 (emphasis added).
>
> [Defendant] argues that *Hodari D.* should be limited to its facts, so that it would apply to this case only if [Defendant] had tossed contraband or illegal aliens from his car. That argument ignores the main point of *Hodari D.* – that one who flees upon a show of authority is not seized until he or she is physically apprehended.  It was the flight, not the discarding of the rock cocaine, that postponed the point of seizure in *Hodari D.* And it was flight that postponed the seizure of [Defendant].
>
> Nor is there any reason to conclude that the reasoning of *Hodari D.* would not apply to automobile chases as well as foot chases.  Indeed, the Supreme Court in *Hodari D.* relied in part on *Brower v. Inyo County*, [489 U.S. 593] (1989), which involved a

twenty-mile automobile chase ending in a fatal crash into a police barricade. The *Hodari D.* opinion noted that in *Brower*, the Court "did not even consider the possibility that a seizure could have occurred during the course of the chase because . . . that 'show of authority' did not produce his stop." *Hodari D.*, 111 S.Ct. at 1552 (quoting *Brower*, [489 U.S. at 597]).

*United States v. Santamaria-Hernandez*, 968 F.2d 980, 983 (9th Cir. 1992).  The Ninth Circuit has also stated:

> Here, a seizure did not occur when [the agent] turned on his overhead lights and sirens, because [defendant] failed to stop.  For purposes of the Fourth Amendment, the only seizure that occurred was when [defendant] swerved and exited his vehicle after the extended car chase. Therefore, the court was free to consider [defendant's] subsequent flight from [the agent] in its evaluation of whether [the agent] had reasonable suspicion to seize [defendant].  *See* [*United States v. Santamaria-Hernandez*, 968 F.2d at 983].

*United States v. Lopez-Ibarra*, 362 F. App'x 677, 678 (9th Cir. 2010).

This case does not present a clear case of flight as in *Hodari D*.  However, Morris initially failed to stop.  Reasonable inferences from the agent's testimony leads to a conclusion the use of the siren and overhead lights, i.e., the initial show of authority, did not effectuate the stop.  Rather, Morris delayed complying with the show of authority and the agent reasonably thought the driver was possibly fleeing or contemplating fleeing.  The Court agrees with the magistrate judge that all of the factors delineated by the magistrate judge (12/27/16 R&R, pp. 7-8) were appropriately considered in determining reasonable suspicion existed to stop the vehicle.

*Reasonable Suspicion*

"Officers on roving border patrols . . . may conduct 'brief investigatory stops' without violating the Fourth Amendment 'if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot.'"  *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc).  In reviewing the totality of the circumstances in determining whether an officer had reasonable suspicion in the context of border patrol stops, the totality of the circumstances may include (1) characteristics of the area,  (2) proximity to the border, (3) usual patterns of traffic and time of day, (4) previous alien or drug

1  smuggling in the area, (5) behavior of the driver, (6) appearance or behavior of passengers,

2  and (7) the model and appearance of the vehicle. *Id*. at 1079.

3          Here, Morris argues that a number of the observed factors could have been innocent.

4  However, while some of the conduct could have possible innocent explanations, reasonable

5  suspicion may be found to exist despite possible innocent explanations for every police

6  observation. *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000). A consideration

7  of the totality of circumstances "precludes a "divide-and-conquer analysis' because even

8  though each of the suspect's 'acts was perhaps innocent in itself . . . taken together, they

9  [may] warrant[ ] further investigation.'" *Valdes-Vega*, 738 F.3d at 1078. While some factors

10 may be more probative than others,the "evaluation cannot be done in the abstract by

11 divorcing factors from their context in the stop at issue." *Id*. at 1079.

12         Agent Rubalcava's observations were grounded in objectively identifiable facts, and

13 the  totality of the circumstances provide more than sufficient bases for a finding of

14 reasonable suspicion. The Court agrees with the magistrate judge's conclusion.

15         Moreover, even if the Court were to consider only the totality of circumstances that

16 occurred prior to the agent activating his overhead lights and siren, the totality of those

17 circumstances establish Agent Rubalcava had reasonable suspicion to conduct a brief

18 investigatory stop. Morris appeared frozen[2] and looked straight ahead. Additionally, the

19 Malibu was tailgating the vehicle driven by Morris in a high crime area close to the border.[3]

20 Subsequently, the two vehicles remained together and both moved to the other lane. It

21 appeared to the agent the drivers of the vehicles were speaking to each other on cell phones.

22 Further, the Malibu then sped up as if to draw the agent's attention from Morris's vehicle

23 which had slowed down. Based on his training and experience, Agent Rubalcava believed

24 the vehicles were traveling in tandem. *United States v. Robert L.*, 874 F.2d 701, 704 (9th

25 _____

26         [2]The agent testified that it looked like both Morris and the passenger were holding
their breaths.

27

28         [3]Agent Rubalcava testified it would take about an hour to an hour and a half to drive
from the international border to location of the incident.

Cir.1989) (The Ninth Circuit "has recognized that traveling in tandem can be indicative of illegal smuggling activity."); *United States v. Larios–Montes*, 500 F.2d 941, 943–944 (9th Cir.1974) (driving in tandem, though not sufficient on its own to establish founded suspicion, is a factor that can be considered) (cert. denied, 422 U.S. 1057 (1975); *United States v. Montero–Camargo*, 208 F.3d 1122, 1139 (9th Cir. 2000) (en banc).

Further, although the agent did not observe any other cars that day with their windows rolled down, both vehicles had their driver's side windows rolled down 4 to 6 inches even though it was raining in the area – in Agent Rubalcava's experience drug and human traffickers roll down their windows because of overwhelming odors from marijuana and unwashed people. Further, the checkpoint was down due to rain, which increases smuggling activity. The vehicle driven by Morris was registered to an address which was out of the area (and did not have any recent history of crossing the international border which meant there was no obvious reason for it to be in the area.

The Court finds reasonable suspicion existed to stop the vehicle driven by Morris.

Accordingly, after an independent review, IT IS ORDERED:

1.      The December 27, 2017 Report and Recommendation (Doc. 45) is ADOPTED.

2.      The January 17, 2017 Report and Recommendation (Doc. 52) is ADOPTED.

3.      The Motion to Suppress (Docs. 35 and 44) filed by Morris is DENIED.

DATED this 3rd day of March, 2017.


                                          Cindy K. Jorgenson
                                          United States District Judge